**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIAM H. PERRY, and HOLLY PERRY, his wife,**

                            **Plaintiffs,**

        **v.**                                  **No. 8:19-cv-726**

                                              **(TJM/DJS)**

**CLAXTON-HEPBURN MEDICAL CENTER, TODD HOWLAND, M.D., JOSHUA POWELL, M.D., ALEXANDER-OSEI-BONSU, M.D., ALI GHARAGOZLOO, M.D., and ROBERT DIGIACCO, M.D.,**

                            **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

Before the Court are the motions for summary judgment of Defendants Ali Gharagozloo, M.D., and Robert DiGiacco, M.D.   See dkt. #s 94, 95.  The parties have briefed the issues, and the Court has determined to decide the matter without oral argument.

**I.    Background**

This case concerns allegations of medical malpractice alleged suffered by Plaintiff William Perry at Defendant Claxton-Hepburn Medical Center ("Claxton") while Perry was a patient in that facility from October 22-24, 2018.  Plaintiffs allege that Defendants, the

1

doctors who treated William Perry after an apparent stroke and the hospital that employed those doctors, injured him by failing to provide timely and appropriate treatment when Perry arrived at the hospital after he collapsed while hunting. The moving Defendants are two of the doctors who treated him during that period, a radiologist and a neurologist.

Plaintiff William Perry was duck hunting on the morning of October 22, 2018 when, at around 7:35 a.m., he became lightheaded, fell off a stool, seemed confused, complained of weakness on his right side, and had difficulty speaking.  Defendant Robert DiGiacco, MD's Statement of Material Facts ("DiGiacco's Statement"), dkt. # 98-1, at ¶ 1.[1]  Perry arrived at the emergency department at Defendant Claxton-Hepburn on October 22, 2018 complaining of right-sided weakness, tingling in his right arm and leg, and slurred speech. Defendant Ali Gharagozloo, MD's Statement of Material Facts ("Gharagozloo's Statement"), dkt. # 94-23, at ¶ 1; Plaintiffs' Response to Defendant Gharagozloo's Statement ("Plaintiffs' Response to Gharagozloo"), dkt. # 99-1, at ¶ 1.[2]  Observers in the emergency department noted that Perry's condition improved while in the department.  Gharagozloo's Statement at ¶ 2.  Emergency department doctors reported that Perry had weakness in his right leg and right hand, and facial droop, but that he no longer slurred words.  DiGiacco's Statement at ¶ 3.  Doctors in the emergency department diagnosed William Perry with a transient ischemic attack ("TIA") and admitted him to the Medical Center for observation.  Gharagozloo's

---

[1]Both moving Defendants filed statements of material facts with citations to the record, and Plaintiffs responded to those statements, admitting and denying with citations to the record.  The Court will refer to Defendant's statements for facts that are undisputed and note disputes where they exist.

[2]Defendant Gharagozloo's statement does not reference slurred speech.  Plaintiffs' citations to the record support this finding, as does Defendant DiGiacco's statement.  See DiGiacco's Statement at ¶ 2.

Statement at ¶ 3.

A radiologist read a CT of the Plaintiff's head as "essentially normal." DiGiacco's Statement at ¶ 4. An 8:49 a.m. triage assessment performed by Shayna Dychtiar, RN, found Perry with "a headache, dizziness, right arm/leg weakness, no facial droop, and slurred speech." Id. at ¶ 5. Defendant Todd Howland, MD, Perry's emergency room provider, at 9:51 a.m. found that Perry had made "fairly rapid improvement" in "his symptoms and his deficits were mostly resolved." Id. at ¶ 6. Dr. Howland performed an exam that rated Perry 4 out 5 on the right side of his body and the rest of Howland's neurological exam was normal. Id. at ¶ 7. Plaintiffs point out that Howland did not use the "Stroke Scale" established by the National Institute of Health ("NIH"), and allege that failing to employ that scale omitted a necessary component of the standard of care. Plaintiffs' Response to DiGiacco's Statement ("Plaintiffs' Response to DiGiacco"), dkt. # 98-1, at ¶ 7. Plaintiffs similarly complain that an exam that Howland performed at 10:03 a.m. failed to use the proper methods. Id. at ¶ 8. In that exam, Dr. Howland found Perry's neurological state "normal . . . aside from 4+ out of 5 right lower extremity weakness." DiGiacco's Statement at ¶ 8.

The parties disagree about Perry's condition upon admission. Defendant DiGiacco alleges that "Mr. Perry was admitted to" the hospital "for observation with the sole deficit of mild right leg weakness." Id. at ¶ 9. Whatever the admitting diagnosis, Plaintiffs contend that Perry suffered from "[a] potentially mobile thrombus in the lumen of" his "proximal left internal carotid artery" at that time. Plaintiffs' Response to DiGiacco at ¶ 9. In any case, when admitted Plaintiff's preliminary diagnosis was that he had suffered a TIA. DiGiacco's Statement at ¶ 10.

3

Defendant Joshua Powell, MD, a hospitalist, took charge of Perry's care upon admission. Id. at ¶ 12.  Powell documented the history and physical he performed on Perry at 11:48 a.m. Id. at ¶ 13.  Perry, Powell states, reported that he "had similar incidents . . . to the one that resulted" in his present hospitalization. Id. at ¶ 14.  Those incidents were not as severe, however, and resolved quickly. Id.  DiGiacco contends that Perry's "symptoms had completely resolved by the time of Dr. Powell's admission assessment," and that Perry's "neurological exam was normal." Id. at ¶ 15.  Plaintiffs agree that Perry's "stated symptoms had resolved," but contend that "the thrombus in Mr. Perry's left internal carotid artery along the posteromedial wall, which was not found until October 24, 2018, was present from October 22, 2018 through October 24, 2018."  Plaintiffs' Response to DiGiacco at ¶ 15.

Dr. Powell testified that he attempted to obtain a neurology consultation with Defendant Dr. DiGiacco.  DiGiacco's Statement at ¶ 17.  Nothing in the record indicates that Dr. DiGiacco actually received notice of this request for a consultation. Id.  The record that Dr. Powell created during the initial history and physical does not "contemplate" a neurological consultation. Id. at ¶ 18.  The parties disagree about whether Dr. Powell contacted Dr. DiGiacco directly. Id. at 19; Plaintiffs' Response to DiGiacco at ¶ 19.  While the Defendant points out that Powell did not speak directly to him regarding a consultation on October 22, 2018, Plaintiffs' point out that the testimony indicates that "Dr. Powell obtained the phone number for Defendant Dr. DiGiacco and placed a call to him."  Plaintiffs' Response to DiGiacco at ¶ 19.  DiGiacco insists he did not "receive" any request for a consultation on that day, but Plaintiffs contend that Powell got DiGiacco's phone number "placed a call to him, and left a message requesting a consult and informing Dr. DiGiacco of

4

Mr. Perry's name, medical record number, and diagnosis." DiGiacco's Statement at ¶ 20; Plaintiffs' Response to DiGiacco at ¶ 20. Defendant contends he never received this request and no evidence exists to prove he received it. DiGiacco's Statement at ¶¶ 21-22. Dr. Powell testified that he was not aware of whether DiGiacco received the request. Id. at ¶ 23.

Dr. DiGiacco was an employee of Defendant Claxton-Hepurn Medical Center on October 22, 2018. Id. at ¶ 24. An attending physician at the hospital, like Dr. Powell, who wanted a neurology consultation with Dr. DiGiacco at that time during normal office hours could call his assistant, Dawn Pike. Id. at ¶ 25. An attending physician could also contact the Defendant on his pager, cell phone, or office phone. Id. That attending physician could also "perhaps" contact the hospital operator or make an "overhead" call. Id. DiGiacco's pager and phone numbers were posted on the hospital website and on printed lists at the nursing stages in the hospital. Id. at ¶ 26. Outside of business hours, a provider who wished to reach Dr. DiGiacco could call his cell phone or contact his pager. Id. at ¶ 27. Despite these available forms of communication, Dr. DiGiacco claims, Powell did not contact him on October 22, 2018. Id. at ¶ 28. Plaintiffs point out that Powell testified that he called DiGiacco on a number provided him and left a detailed message about Perry requesting a consultation and provided medical record numbers and a diagnosis. Plaintiffs' Response to DiGiacco at ¶ 28.

Dr. Powell passed Perry's care onto Dr. Alexander Osei-Bonsu on the evening of October 22, 2018. DiGiacco's Statement at ¶ 29. Powell could not recall if he told Osei-Bonsu about his request for a consultation with Dr. DiGiacco. Id. at ¶ 30. Plaintiffs point out, however, that Powell testified that he could not recall informing Osei-Bonsu about the

5

request, but testified that "it would be his usual practice to do so."  Plaintiffs' Response to DiGiacco at ¶ 30.

Notes indicate that a nurse observed William Perry to have right-sided facial droop, weakness of his lower right and left side, and aphasic speech at approximately 4:00 a.m. on October 23, 2018.  Gharagozloo's Statement at ¶ 4.  Defendant contends that Perry's "last known normal" occurred at around 2:00. a.m. on October 23, 2018.  Id. at ¶ 5.  Plaintiffs dispute this claim, pointing out that medial records demonstrate observations taken at 3:00 a.m. on October 23, 2018, show "no neurological symptoms."  Plaintiffs' Response to Gharagozloo, at ¶ 5; see also, DiGiacco's Statement at ¶ 33 (noting that "Although Nurse Sarah Carsman states a last known normal time of 02:00, a note entered by her at 3:00 AM on the 23rd documented a normal neurologic exam.  She clarified in her deposition that she felt a need to be certain in determining when he was last normal, and her memory of 02:00 AM was reliable as he was awake and conversive.").

Defendant Gharagozloo contends that "last known normal" refers to "the last time a patient was known to be without signs or symptoms of a stroke."  Gharagozloo's Statement at ¶ 6.  Plaintiffs respond that the time of the "last known normal" is complicated by the events that led Perry to the hospital in the first place.  Plaintiffs' Response to Gharagozloo, at ¶ 6.  The "stroke symptoms," Plaintiffs contend, may have been "a continuation of a previous stroke from October 22, 2018."  Plaintiffs' Response to Gharagozloo, at ¶ 6.  "if the stroke symptoms were a new event," by contrast, "then the last known well is the last time a patient was known to be without signs or symptoms of strike since resolution of the prior event."  Id.

After nurses found this change in William Perry's condition, Dr. Onsei-Bonsu, the

attending physician, evaluated him.  DiGiacco's Statement at ¶ 34.  Dr. Onsei-Bonsu found

Perry to have slurred speech, 1/5 upper right extremity strength, 4/5 right lower extremity

strength, and decreased sensation in the right arm and forehead.  Id.  At 4:17 a.m. Doctor

Osei-Bonsu orded a STAT head CT.  Id. at ¶ 35.  That exam yielded findings consistent with

an acute left [middle cerebral artery ("MCA")] territory infarction.  Id. at ¶ 36.

After receiving information from the CT scan, Dr. Osei-Bonsu ordered an MRA of the

head with contrast at 5:43 a.m.  Id. at ¶ 37.  Dr. Osei-Bonsu cancelled that order at 5:43

a.m. and ordered an MRA of the head without contrast at 5:55 a.m.  Id.  He also ordered an

MRA of the neck without contrast at 5:43 a.m. and an MRI of the brain without contrast at

5:43 a.m.  Id.  At 5:50 a.m. Dr. Osei-Bonsu ordered aspirin, a statin, and an neurology

consult, the later of which was placed in the chart at 5:50 a.m.  Id. at ¶ 38.

Dr. Gharagozloo interpreted the brain MRI, head MRA, and the neck MRA at

approximately 9:00 a.m. on October 23, 2018.  Gharagozloo's Statement at ¶ 9.  The brain

MRI revealed "a moderate to large acute non-hemorrhagic temporoparietal lobe infarct."  Id.

at ¶ 10.  Dr. Gharagozloo contends that the head MRA "showed poor flow of the peripheral

branches of the left middle cerebral artery."  Id. at ¶ 11.  Plaintiffs contend that the MRA

showed "extremely poor" flow.  Plaintiffs' Response to Gharagozloo at ¶ 11.  The neck MRA

demonstrated "minimal smooth plaque formation of both carotid bulbs."  Gharagozloo's

Statement at ¶ 12.  Gharagozloo also claims that he observed turbulent flow in interpreting

the neck MRA.  Id. at ¶ 13.  Plaintiffs dispute that the interpretation demonstrates that Dr.

Gharagozloo made this observation.  Plaintiffs' Response to Gharagozloo at ¶ 13.  Dr.

Gharagozloo contends that a finding of turbulent flow is not uncommon in an interpretation

of a neck MRA.  Gharagozloo's Statement at ¶ 14.  Plaintiffs, citing to expert opinion,

contend that such a finding is not common.  Plaintiffs' Response to Gharagozloo at ¶ 14.

The parties also disagree about whether the use of intravenous contrast in the images

would eliminate turbulent flow in an MRA study.  <u>Compare</u> Gharagozloo's Statement at ¶ 15

with Plaintiffs' Response to Gharagozloo at ¶ 15.  They also disagree about whether the

standard of care required Gharagozloo to mention turbulent flow in his report on the neck

MRA.  <u>Compare</u> Gharagozloo's Statement at ¶ 16 with Plaintiffs' Response to Gharagozloo

at ¶ 16.

 The parties disagree about when Perry's "last known normal" occurred, but they

agree that Perry was not a candidate for administration of tissue plasminogen activator

("tPA"), a drug used to treat strokes, at 9:00 a.m. on October 23, 2018 due to the amount of

time that had passed since his last normal.  <u>Compare</u> Gharagozloo's Statement at ¶¶ 17-18

and Plaintiffs' Response to Gharagozloo at ¶¶ 17-18.  Another potential treatment for a

stroke victim is a mechanical thrombectomy, which Dr. Gharagozloo points out has risks

that "include new stroke, damage to blood vessels, and brain bleed."  Gharagozloo's

Statement at ¶ 20.  The parties disagree about the potential risks and benefits of that

treatment.  <u>See</u> Gharagozloo's Statement at ¶¶ 22-24; Plaintiffs' Response to

Gharagozloo's Statement at ¶¶ 22-24.  They also disagree about whether Perry was a

candidate for such treatment after 9:00 a.m. on October 23, 2018.  <u>Compare</u> Gharagozloo's

Statement at ¶ 25; Plaintiffs' Response to Gharagozloo at ¶ 25.

 Nurse Alisa Armstrong acknowledged Dr. Osei-Bonsu's electronic order for a

neuorology consultation at 7:15 a.m.  DiGiacco's Statement at ¶ 39.  DiGiacco claims that

he "was not notified or otherwise contacted regarding the order for neurology consultation

on the 23rd."  <u>Id.</u> at ¶ 40.  Plaintiffs dispute this claim, pointing out that DiGiacco accessed

Perry's medical records on that day.  Plaintiffs' Response to DiGiacco at ¶ 40.  Both sides agree that the consultant request was not labeled STAT.  DiGiacco's Statement at ¶ 41. DiGiacco contends that the standard of care for a neurologist requires a response within twenty-four hours for a non-urgent request.  Id. at ¶ 42.  Pointing to one of their expert reports, Plaintiffs dispute that DiGiacco could meet the standard of care under the circumstances by failing to respond in an urgent fashion.  Plaintiffs' Response to DiGiacco at ¶ 42.  DiGiacco claims that he saw Perry at 7:45 a.m.; Plaintiffs' dispute that claim, pointing to a medical record that appears to indicate that DiGiacco visited Perry at 7:45 p.m. DiGiacco's Statement at ¶ 43; Plaintiffs' Response to DiGiacco at ¶ 43.  In any case, the parties agree that DiGiacco accessed Perry's electronic records at 6:43 a.m., 6:46 a.m., 7:27 a.m., and 11:48 a.m. on October 23, 2018.  DiGiacco's Statement at ¶¶ 44-45.  Also at some point on October 23, 2018 DiGiacco obtained information from Plaintiff Holly Perry, William Perry's wife.  Id. at ¶ 46.  Deposition testimony indicates that this conversation between DiGiacco and Holly Perry occurred in the morning of October 23.  Id. at ¶ 47. DiGiacco testified that his practice was to consult the medical records before going to a patient's bedside to complete the evaluation.  Id. at ¶ 48.

The parties' experts disagree about whether Perry's brain damage was irreversible by 8:21 a.m. on October 23, 2018.  Compare DiGiacco's Statement at ¶ 50; Plaintiffs' Response to DiGiacco at ¶ 50.  In his consultation note, Dr. DiGiacco referenced the various MRI and MRA findings that had been signed by the radiologist by 1:42 p.m. on October 23.  DiGiacco's Statement at ¶¶ 51-52.  DiGiacco confirmed the stroke diagnosis and "documented that Mr. Perry suffered a left-MCA ischemic stroke with language, sensory, and motor deficits."  Id. at ¶ 53.  In completing his consultation, DiGiacco

"conducted a neuorological examination" of Perry.  Id. at ¶ 54.  Dr. DiGiacco also

recommended that a "work up" occur "to determine the cause of the stroke as the patient

had no risk factors and there was no evidence of a cariogenic embolic source or large-

vessel extracranial vascular disease."  Id. at ¶ 54.  The note also concluded that no

evidence of dissection existed, and that "by exclusion," DiGiacco "suspected intracranial

vascular disease or coagulation abnormalities."  Id. at ¶ 55.  Dr. DiGiacco also

recommended another neck CTA and continuing with antiplatelet therapy.  Id. at ¶¶ 56-57.

Dr. DiGiacco "rounded on" Perry on the morning of October 24, 2018.  Id. at ¶ 59.

He noted that a CTA of the neck had not been ordered or performed, and placed an order

for such a study.  Id. at ¶ 60.  He contends that the CTA exam took place that morning.  Id.

Plaintiffs deny DiGiacco's statements in this respect, noting that the examination did not

occur until the afternoon on October 24.  Plaintiffs' Response to DiGiacco at ¶ 60.  The CTA

revealed that "the filling defect seen on the patient's MRA one day earlier which was

thought to represent a turbulent flow, at this time in fact was representative of a thrombus in

the proximal left internal carotid artery.  This measured approximately 2.5 x 3 mm and arose

from the posterior aspect of the origin of the left internal carotid artery."  DiGiacco's

Statement at ¶ 61.  Discussing the results with attending "staff," DiGiacco concluded "that

the thrombus was likely a result of ruptured plaque rather than an embolic thrombus based

on the surrounding calcification seen around the thrombus on imaging."  Id. at ¶ 62.

Dr. DiGiacco recommended a heparin drip for the patient, as well as that the

attending hospitalist, Dr. Rashmi Thatte, contact the vascular surgery center at Upstate

University Hospital in Syracuse, New York.  Id. at ¶ 63.  Dr. Thatte consulted with the stroke

attending physician at Upstate, who recommended that the heparin drip be discontinued

until a further cardiac examinations could occurr.  Id. at ¶ 64.  Dr. Thatte recommended

transfer to Upstate for more extensive neurological coverage.  Id. at ¶ 65.

     The attending neurologist at Upstate, Antonio Culebras, MD, accepted Perry for

transfer.  Id. at ¶ 66.  Perry left Claxton-Hepburn at 9:25 p.m. on October 24, 2018.  Id. at ¶

67.  He arrived at Upstate at 11:18 that evening.  Id.  The parties' experts disagree about

whether Perry's condition worsened between October 23, 2018 and the time of his transfer

to Upstate on October 24, 2018.  Compare DiGiacco's Statement at ¶¶ 68-69 and Plaintiffs'

Response to DiGiacco at ¶¶ 68-69.

     Plaintiffs filed their Complaint, which alleges medical malpractice against many of the

physicians who treated Perry at Clapton-Heburn, as well as against the hospital, in this

Court on June 18, 2019.  See dkt. #1   Plaintiff Holly Perry, William Perry's wife, seeks

recovery for loss of consortium.  Id.  Defendants answered the Complaint, and the parties

engaged in extensive discovery.  At the close of discovery, the moving Defendants filed the

instant motions.  The parties have briefed the issues.

## II.    Legal Standard

     Moving Defendants seek summary judgment.  It is well settled that on a motion for

summary judgment, the Court must construe the evidence in the light most favorable to the

non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may

grant summary judgment only where "there is no genuine issue as to any material fact and

... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An

issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

     A party seeking summary judgment bears the burden of informing the court of the

basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

**III.   Analysis**

Defendants have each filed a motion for summary judgment, which the Court will address in turn.

### A.   Dr. Gharagozloo

Dr. Gharagozloo argues that he is entitled to summary judgment because his treatment of William Perry did not deviate from the standard of care under the circumstances. Even if his treatment did not meet the standard of care, he contends, his alleged failings were not a proximate cause of Perry's injuries. Dr. Gharagozloo further contends that, since Plaintiffs cannot demonstrate medical malpractice, Plaintiff Holly Perry cannot sustain her loss of consortium claim.

Plaintiffs raise medical malpractice claims against Dr. Gharagozloo. "[T]o establish a

claim of 'medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached a standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994)).  In addition, "except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required" to establish these elements. Id.   A physician defending a medical malpractice action can meet his burden on summary judgment "'by the submission of affidavits and/or deposition testimony and medical records which rebut plaintiff's claim of [medical] malpractice with factual proof.'" Suib v. Keller, 6 A.D.3d 805, 806, 774 N.Y.S.2d 608, 609 (3d Dept. 2004) (quoting Horth v. Mansur, 243 A.D.2d 1041, 1042, 663 N.Y.S. 2d 703 (1997)).  A plaintiff is then required to "rebut defendant's showing by demonstrating, typically through expert medical opinion, a deviation from accepted practice and that the deviation was the proximate cause of the injury." Id.

Dr. Gharagozloo points to his declaration, which he asserts rebuts any claims of negligence raised against him. See Declaration of Ali Gharagozloo, MD, dkt. # 94-21 ("Gharagozloo Dec.").  Dr. Gharagozloo relates that his only involvement in Perry's treatment involved evaluating 6 different "radiologic studies": (1) an October 22, 2018 brain CT without contrast; (2) an October 23, 2018 brain CT without contrast; (3) an October 23, 2018 brain MRI; (4) an October 23, 2018 neck MRA; (5) an October 23, 2018 head MRA; and (6) a CT/CT angio of the neck from October 24, 2018. Id. at ¶ 4.  He did not speak with Perry about the images, but instead simply reviewed them "after they were completed and appeared in [his] que in Claxton-Hepburn Hospital's . . . system." Id. at ¶ 5.  Gharagozloo interpreted Perry's magnetic resonance angiogram ("MRA") at around 9:00 a.m. on October

13

23, 2018.  Id. at ¶ 6.  Radiologists use MRAs "to evaluate blood vessels within the body."
Id.  Dr. Gharagozloo noted "a small of amount of plaque in the carotid bulbs" and "turbulent
flow in the left internal carotid artery."  Id. at ¶ 7.  His report did not mention the turbulent
flow he observed, instead noting only "minimal smooth plaque formation of both carotid
bulbs."  Id. at ¶ 8.  Dr. Gharagozloo explains that physicians describe blood flowing
smoothly through an artery as "laminar flow."  Id. at ¶ 12.  "[I]f the blood flow is not smooth,"
doctors describe the flow as "turbulent."  Id.  Radiologists like Dr. Garagozloo find "[i]t . . .
not uncommon to observe turbulent blood flow when interpreting a MRA of the carotid
arteries because the main artery bifurcates into two arters, the left and right internal carotid
artery."  Id. at ¶ 13.  Failing to include the presence of turbulent flow in his report, he
therefore claims, did not violate the standard of care.  Id. at ¶ 19.

Dr. Gharagozloo asserts that he did not "deviate from accepted standards of care by
interpreting the study as flow turbulence as opposed to a thrombus"–a blood clot.  Id. at
¶ 14.  He also claims that using "intravenous contrast" in the study would have shown the
presence of a thrombus.  Id. at ¶ 15.  While such contrast "can help reduce turbulent flow,"
using such contrast "does not completely eliminate turbulent flow."  Id. at ¶ 16.

Defendant also includes a declaration from Dr. Gary Bernardini, M.D., PhD., in
support of his motion for summary judgment.  See Declaration of Gary Bernardini
("Bernardini Dec."), dkt. # 94-22.  Defendant uses this report to argue that his alleged
malpractice was not a proximate cause of Perry's injuries.  Bernardini focuses solely on Dr.
Gharagozloo's interpretation of the October 23, 2018 neck MRA.  Id. at ¶ 4.  He notes that
Plaintiffs claim "that Dr. Gharagozloo failed to properly interpret the October 23, 2018 neck
MRA, including failing to observe and note a thrombus in the left internal carotid artery

14

("ICA")." <u>Id.</u> at ¶ 5.  This failure to identify the thrombus allegedly deprived Perry of an opportunity to receive tPA or obtain a timely transfer to another facility, where he could "undergo endovascular intervention/mechanical thrombectomy." <u>Id.</u>

Bernardini concludes that "even if Dr. Gharagozloo had appreciated and reported the presence of a left ICA thrombus on the October 23, 2018 neck MRA Mr. Perry's treatment would not have changed." <u>Id.</u> at ¶ 6.  Dr. Bernardini explains that "tPA is a blood thinner that works by preventing the enlargement of blood clots that obstruct the flow of blood in the brain." <u>Id.</u> at ¶ 15.  When "administered in a timely fashion, tPA can help limit the impact of an ischemic stroke." <u>Id.</u>  Bernardini explains that tPA must be administered within 4.5 hours of the patient's "last known normal" to be effective. <u>Id.</u> at ¶ 16.  Since Perry's last known normal was at 2:00 a.m. and Dr. Gharagozloo did not read the MRA until 9:00 a.m., Dr. Gharagozloo's failure to discover a thrombus was immaterial to whether doctors could timely administer tPA to the Defendant. <u>Id.</u> at ¶¶ 17-21.

Similarly, Dr. Bernardini finds that Dr. Gharagozloo's failure to diagnose a thrombus in a timely fashion did not deprive Perry of any effective treatment that could have come from revascularization/mechanical thrombectomy. <u>Id.</u> at ¶ 23.  Dr. Bernardini explains that "[a] mechanical thrombectomy is a neuro-interventional procedure where a catherter is placed into the impacted vessel within the brain to remove the clot at issue." <u>Id.</u> at ¶ 24. Pointing to the other studies of Perry's brain, Dr. Bernardini concludes that "because such a significant portion of Mr. Perry's brain was already damaged, there was not enough undamaged brain tissue left to salvage [to] warrant the risks attendant to mechanical intervention." <u>Id.</u> at ¶ 26.  The size of Perry's stroke also meant that "endovascular intervention carried with it a significant risk of reperfusion injury," a situation where removal

15

of a clot causes blood to reenter the area formerly closed off in a way that "can damage the tissue of the vessel" and "result in significant complications, including hemorrhage." Id. at ¶¶ 27-28.  Reperfusion would have caused significant additional injury, Dr. Bernardini opines.  Id. at ¶ 29.  The risks of such a procedure, he claims, outweighed any benefit.  Id.

Plaintiffs respond to these declarations with two expert declarations.  First, they supply a declaration from Amish H. Doshi, M.D., a board-certified radiologist.  See Declaration of Amish H. Doshi ("Doshi Dec."), dkt. # 99-2.  In examining the October 23, 2018 MRA, Dr. Doshi finds that "[a]t the origin of the left internal carotid artery along the posteromedial wall there is a 1.2 cm (craniocaudal) by 0.4 cm (anterior posterior) hypointense filling defect consistent with intraluminal thrombus."  Id. at ¶ 9.  Dr. Doshi contends that "[t]his thombus was missed by Dr. Gharagozloo."  Id.  Further, Dr. Doshi notes that the brain MRI and the MRA of the head and neck "are consistent with findings of acute stroke secondary to an occlusion of the left middle cerebral artery."  Id. at ¶ 10.  He concludes that "[t]he etiology of the cause of the occlusion is suggested to be a clot or thrombus originating from a clot/thrombus within the origin of the left internal carotid artery as seen on MRA of the neck."  Id.  "Radiographic findings of hypointense filling defect with surrounding contrast along the origin of the left internal carotid artery are consistent with the appearance of a clot/thrombus."  Id.  Dr. Gharagozloo erred, Doshi finds, in interpreting the thrombus as turbulent flow and failing to find a thrombus based on the evidence.  Id. at ¶ 13.  The neck CRA performed the next day confirms this analysis.  Id. at ¶ 14.  The MRI of the brain also shows that Dr. Gharagozloo missed "a smaller acute infarct within the medial left frontal lobe[.]   Id. at ¶ 15.

In the end, Dr. Doshi finds that "[s]imply put, Dr. Gharagozloo missed the thrombus."

Id.  Dr. Doshi addresses breaches of the standard care.  Id. at ¶ 16.  First, he concludes that "a diagnostic radiologist interpreting stroke related imaging would be expected to identify a filling defect within an arterial vessel on a contrast-enhanced MR angiogram as clot or thrombus within that vessel."  Id.  Second, Doshi finds that "if the presence of turbulent flow was observed in the 10/23/18 neck MRA study and identified instead of a thrombus, that should have been noted in Dr. Gharagozloo's report."  Id.  In addition, Dr. Doshi finds that the presence of the thrombus should have also been apparent to Dr. Gharagozloo because of the fact that Perry suffered a stroke, which had been confirmed by the brain MRI.  Id. at ¶ 17.

Plaintiffs also supply the expert declaration of Michael Meyer, M.D.  See Declaration of Michael Meyer ("Meyer Dec."), dkt. # 99-3.  Meyer is a board-certified neurologist who has directed stroke centers and helped author studies on the use of tPA.  Id. at ¶ 1.  After summarizing the treatment Perry received after his initial appearance at the Defendant hospital, Dr. Meyer notes that Dr. Gharagozloo "missed a thrombus in the left carotid" when he examined the October 23, 2018 MRA.  Id. at ¶ 15.  He further finds that a CTA performed on October 24, 2018 "finally identified the missed thrombus that had been present since Mr. Perry first presented to CHMC ED on October 22, 2015."  Id. at ¶ 16.  Meyer concludes that "Dr. Gharagozloo's departure in missing the thrombus cost Mr. Perry an additional 18 hours of time before he was transferred.  Id.  This failing, Meyer opines, "placed Mr. Perry outside the window of time for stroke therapies that more likely than not would have lessened his injuries."  Id.

Meyer finds that, had Dr. Gharagozloo identified the thrombus during his 9 a.m. evaluation of the MRA on October 23, 2018, the standard of care would have required "an

17

immediate transfer to Upstate University Hospital."  Id. at ¶ 17.  Dr. Meyer posits that Perry would have arrived at Upstate at around 11:30 a.m. on October 23, 2018.  Id.  He would have arrived, Meyer calculates, at Upstate within 8.5 hours of his last known well.  Id. Meyer finds that "[i]n October of 2018, the standard of care regarding the window of time to perform a mechanical thrombectomy such as the one Mr. Perry required, was 24 hours from the last known well."  Id.  He notes that "Upstate Hospital was instrumental in this enlargement of time and one of the pioneers of its application."  Id.

Meyer concludes that "[i]t is more likely than not that a mechanical thrombectomy would have restored flow distal of the occlusion and mitigated Mr. Perry's injuries."  Id. at ¶ 19.  Meyer disagrees with Dr. Bernardini's opinions in this respect, noting that "[i]maging alone cannot be used to form an opinion regarding the extent of injuries as they relate to precise present cognitive deficits."  Id.  The 24-hour treatment period, Meyer opines, exists "specifically because it is now known that restored flow to the brain within this window lessens injuries."  Id. Dr. Meyer also finds that the potential benefits of the therapy outweigh the risks identified by Dr. Bernardini.  Id. at ¶ 20.

As a preliminary matter, the Court finds that Defendant has met his burden to produce competent evidence to make out a prima facie case that he did not commit medical malpractice or, even if he committed such malpractice, that malpractice was not a proximate cause of Perry's injuries.  The burden now shifts to the Plaintiffs to produce their own competent rebuttal evidence.

In reply to Plaintiff's briefing, Defendant does not address Dr. Doshi's opinions that Dr. Gharagozloo breached the standard of care by failing to identify the thrombus when he examined the October 23, 2018 MRA.  Instead, Defendant focuses on the sufficiency of Dr.

18

Meyer's opinion that Perry could have benefitted from a mechanical thrombectomy if transported to Upstate on October 23rd after a proper diagnosis of a thrombus.  He contends that Dr. Meyer fails to provide any basis for his conclusions, but instead engages in mere speculation.  Moreover, he claims, Dr. Meyer does nothing to rebut Dr. Bernardini's conclusions about the amount of injury demonstrated in the images and the inability of treatment to address such issues.  Defendant contends that Meyer's opinions are too speculative to rebut Dr. Bernardini's findings.  As such, he claims, Plaintiffs have failed to meet their burden in this respect.

The Court first notes that Defendant does not argue that Dr. Doshi's report provides a sufficient factual basis to rebut Dr. Gharagozloo's claims that his conduct did not violate the standard of care.  The Court finds that a jury must determine whether Defendant's failure to diagnose a thrombus when he viewed the October 23, 2018 MRA amounted to a breach of the standard of care.  Dr. Doshi explains in sufficient detail how a proper evaluation of the image would have occurred, how Dr. Gharagozloo should have used other evidence from other images and medical reports to supplement his evaluation of the image, and how an ordinary professional radiologist would have found the thrombus in reading the image.  Sufficient evidence exists for a reasonable juror to conclude that Defendant breached the standard of care in this respect.

Defendant rightly focuses on whether the breach of the standard of care was a proximate cause of Perry's injuries from the stroke.  The parties appear to agree that the breach of the standard of care could be seen as a proximate cause of Perry's injuries only if he had some realistic hope of successful treatment if transported to Upstate medical center within a sufficient amount of time.  Both sides also appear to agree that the only hope for

treatment at that point would come in the form of a mechanical thrombectomy.  Defendant's expert concludes that Perry had already suffered injuries that were too severe to have hope of successful treatment, and that the risks of the procedure causing further injury outweigh any hope of better treatment.  He dismisses as speculation Dr. Meyer's claim that the injuries were perhaps less severe than the images suggested, and that the hope of recovery by removing the thrombus mechanically would have been worth the risk.

Defendant is correct that, having met his burden to produce expert opinion concluding that his conduct was not a proximate cause of Perry's injuries, "'[t]he burden then shifted to plaintiff[] to raise triable issues of fact by submitting a physician's affidavit both attesting to a departure from accepted practice and containing the attesting [physician's] opinion that the defendant[s'] omissions or departures were a competent producing cause of the injury.'" Bagley v. Rochester Gen. Hosp., 124 A.D.3d 1272, 1273 (4th Dept. 2015) (quoting O'Shea v. Buffalo Med. Group, P.C., 64 A.D.3d 1140, 1141, 882 NYS2d 619 (NY 2009) (alterations in original)).  To meet this burden, a plaintiff must provide more than "'[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice[.]'"  Id. (quoting Alvarez v. Prospect Hosp., 68 NY2d 320, 325 (NY 1986)).  Expert opinions that "'are speculative and unsupported by any evidentiary foundation'" are not sufficient to avoid summary judgment.  Id. (quoting Diaz v. New York Downtown Hosp., 99 NY2d 542, 544 (NY. 2002)).  To avoid summary judgment, "the plaintiff's expert must specifically address the defense expert's allegations."  DiLorenzo v. Zaso, 148 A.D.3d 1111, 1112 (2d Dept. 2017).

The Court finds that Dr. Meyer's opinion is sufficiently detailed and relies on sufficient

evidence to meet the Plaintiffs' burden and avoid summary judgment.  To avoid being "'considered speculative or conclusory, expert opinions in opposition should address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record.'" Mendoza v. Maimonides Med. Ctr., 160 N.Y.S.3d 663, 665 (2d Dept. 2022) (quoting Tsitrin v. New York Community Hosp., 154 A.D.3d 994, 996 (2d Dept. 2017)).  Here, Dr. Meyer addresses the specific evidence offered by Dr. Bernardnini, explaining why the medical techniques pioneered at Upstate had expanded the time when mechanical thrombectomies could prove effective. He also takes issue with Bernardinia's claims about the extent of the damage revealed in the images, pointing out that stroke treatment had demonstrated that images sometimes fail to capture the true nature of the damage.  In the end, Dr. Meyer's report is sufficient to raise a question of fact about the proximate cause of Perry's injuries that a jury must decide.

Defendant seeks dismissal of Holly Perry's loss of consortium claim solely on the basis that Defendant is entitled to summary judgment on William Perry's medical malpractice claim.  Defendant is correct that a consortium claim in New York is a "derivative action" and that dismissal of William Perry's action would require dismissal of Holly Perry's claim as well.  Cody v. Lake George, 177 AD2d 921, 923 (3d Dept. 1991).  Since the Court has concluded that Defendant is not entitled to summary judgment on William Perry's claim, Holly Perry's derivative claim survives as well.

For those reasons, the Court will deny Defendant Dr. Gharagoozol's motion for summary judgment.

## B.    Dr. DiGiacco

Dr. DiGiacco likewise claims that his treatment of William Perry met the standard of

care, and that even if a jury could find that treatment wanting, a reasonable juror could not

conclude that DiGiacco's failings were a proximate cause of Perry's injuries.  He supplies

expert reports and points to other evidence to support these arguments.  Dr. DiGiacco also

contends that Plaintiffs' expert reports and testimony do not undermine his prima facie

case.  The Court will address the evidence, expert reports, and arguments in turn, applying

the standard for medical malpractice recited above.

Defendant supplies two expert reports.  William J. Kingston, MD, authored the first.

See Exh. M to Defendant DiGiacco's Motion ("Kingston Report"), dkt # 95-14.  Dr. Kingston

has training and extensive experience as a neurologist, including providing in-hospital

consultations.  Id. at 1.[3]  Dr. Kingston opines that DiGiacco "complied with the standard of

care applicable to a general neurologist in a community hospital setting and that plaintiffs'

allegations and the opinions of their experts are unfounded."  Id. at 2.  Though disputes

have arisen about how quickly Dr. DiGiacco saw Perry, Kingston finds no malpractice even

if DiGiacco did not first examine Perry personally until 7:45 p.m. on October 23, 2018.  Id. at

5.  DiGiacco was not informed of any urgent needs, and saw Perry within an acceptable

time on that basis.  Id.  He also rejects the notion that Dr. DiGiacco failed to recommend

anti-platelet therapy, and disputes Dr. Meyer's claim that "inter-arterial stroke therapy could

have been an option for this patient on the morning of the 23rd."  Id. at 2-3.  Transfer to

Upstate would have taken too long and placed Perry outside the time frame for successful

therapy of that type.  Id. at 3.  Kingston also rejects the idea that DiGiacco breached the

standard of care by failing to arrange for a STAT telemedicine consultation with Upstate; he

---

[3]The report is not paginated.  The Court has denoted the pages of the actual report consecutively, beginning with the first page of text.

notes that the emergency department usually arranges for such meetings and finds that DiGiacco's experience as a neurologist made such consultation unnecessary.  Id.  Kingston also finds that, by the time that DiGiacco treated Perry, the window for either tPA or a mechanical thrombectomy had closed, at least according to expert understanding in 2018. Id. at 3-4.  Moreover, Kingston concludes that imaging reveals that the stroke that occurred between 2:00 a.m. and 4:00 a.m. on October 23, 2018 caused irreversible damage.  Id. at 4.  "There was nothing that Dr. DiGiacco did in his treatment on October 23 or October 24 that worsened Mr. Perry's condition, and there is also no evidence that he failed to do anything that resulted in any worsening of Mr. Perry's condition or that he could have done anything to improve his outcome in any way."  Id.

Jay Morrow, M.D., Ph.D, also prepared an expert opinion in support of Dr. DiGiacco's motion.  See Report of Jay Morrow ("Morrow Report"), Exh. M. to DiGiacco's motion for summary judgment, dkt. # 95-14.[4]  Dr. Morrow practices neurointerventional surgery in a comprehensive stroke center.  Id. at 1.  After explaining the history of the case, Dr. Morrow finds that "[b]y the time Dr. DiGiacco became involved in Mr. Perry's care, the infarct had been completed as evidenced by the MRI of the brain from 10/23/2018.  Unfortunately, nothing could have been done by the time the MRI was completed that would have changed Mr. Perry's outcome."  Id. at 6.  Dr. Morrow notes that Dr. Osei-Bonsu did not order a neurology consultation or imaging in a STAT fashion.  Id.  He finds that, under the circumstances, "placing a computer consult without further action reasonably places the consult in a non-STAT category."  Id.  No one, Morrow claims, contacted DiGiacco directly

---

[4]This report is also not paginated.  The Court will follow the same process.

to inform him of the need for consultation, and nothing told him the evaluation was urgent. Id. No evidence supports a claim that Dr. Powell ever contacted DiGiacco, and nothing indicates he ever heard that request. Id. Moreover, the initial event had appeared to resolve itself, and nothing indicates that Dr. DiGiacco could have provided useful treatment on the 22nd. Id. In any case, Dr. Morrow concludes, faster action by Dr. DiGiacco on October 23 "almost certainly wouldn't have affected Mr. Perry's ultimate outcome." Id. Even if Dr. DiGiacco had consulted with Dr. Osei-Bonsu at 6:43 a.m., the window for effective treatment with tPA had closed by that time. Other potential treatments, whether at Claxton-Hepburn or Upstate, also failed to fit the time frame. Id. 6-7. Even if Plaintiffs' claim is that Dr. DiGiacco committed malpractice by failing to render a consult based on the contact from Dr. Powell on October 22, he did not violate the standard of care, Morrow contends. Id. at 7. The standard of care requires contact within twenty-four hours in non-urgent situations, and nothing told DiGiacco that the matter was urgent. Id. In the end, after discussing possible treatments regardless of timing, Dr. Morrow finds that "there is no action Dr. DiGiacco could have taken at the time he was aware of Mr. Perry to have improved upon Mr. Perry's ultimate clinical outcome." Id. at 9.

Plaintiffs rely on another expert declaration from Meyer to dispute DiGiacco's expert opinions. See Exh. 1 to Plaintiffs' Response to DiGiacco's Motion, dkt. # 98-2. Dr. Meyer argues that Dr. DiGiacco's failure to meet the standard of care made Perry's injuries worse. Id. at ¶ 19. Dr. DiGiacco's failings allegedly "prevented any required stroke therapy that could have been administered to prevent Mr. Perry's injuries." Id. Such "therapies would have prevented, or prevented worsening of the injuries." Id. Perry's transfer to Upstate shortly after the initial incident on October 22 would have "very likely" prevented "the life

24

long disability of the major stroke incurred in the hospital on day two at 3AM[.]" Id.  Transfer immediately after Dr. DiGiacco viewed the medical record at 6:43 a.m. on October 23 would have prevented Perry from experiencing injuries "as significant as they are today." Id.  Even transferring Perry at 7:45 a.m. on October 23 would have decreased the injuries he suffered.  Id.

In discussing DiGiacco's alleged breaches of the standard of care, Meyer addresses the parties' dispute over whether Dr. Powell contacted Dr. DiGiacco on October 22, 2018. Id. at ¶ 21-22.  While Meyer acknowledges that a question of fact exists on the issue of Powell's contact with DiGiacco and DiGiacco's awareness of that attempt, Meyer alleges that "if Dr. Powell indeed placed the call as he testified, requested the consult as he testified, gave the diagnosis (which was TIA at the time) as he testified and gave the Medical Record Number as he testified, the neurological standard of care requires an urgent neurological consult after that request is made." Id. at ¶ 22.  The reason for such urgency, Meyer explains, is because "patients who experience TIA are known to be at risk for CVA"; such a stroke occurred in this case.  Id. at ¶ 23.  Failing to respond to a request for consultation under the circumstances amounted to a breach of the standard of care, and this failing, Dr. Meyer contends, was a cause of Perry's injuries.  Id. at ¶ 24.  An early intervention would have led to an earlier discovery of the thrombus that caused the injury. Id. at ¶ 25.  Beyond providing proper treatment immediately for the thrombus, Perry would also have been transferred to Upstate, where more extensive treatment could have occurred.  Id. at ¶¶ 26-28.  Even if doctors at Upstate could not treat the thrombus before a stroke occurred, those doctors would have provided immediate treatment after the stroke that would have improved Perry's outcome, Meyer claims.  Id. at ¶ 29.  The doctor also

opines that, had DiGiacco acted to transfer Perry immediately after his initial review of the medical records, Upstate doctors would have been able to perform a mechanical thrombectomy that would also have improved Perry's outcome.  Id. at ¶¶ 30-31.  Dr. Meyer also disputes Dr. Morrow's opinion that Perry's condition would not have changed with transfer.  Id. at ¶ 32.  Discussing the imaging taken at Claxton-Hepurn and later at Upstate, he opines that "while I agree with [Morrow] overall that there is a rough approximate match of the MM diffusion changes from Oct. 23 with the Syracuse CT images of Oct. 26, this method can not be used to Opine regarding specific injuries that would have been mitigated."  Id.  Meyer also opines that DiGiacco breached the standard of care whether he arrived to examine Perry for the first time at 7:45 a.m. or 7:45 p.m. on October 23, 2018.  Id. at ¶¶ 34-35.  If DiGiacco arrived at 7:45 a.m., Meyer claims, he should have immediately transferred Perry to upstate.  Id. at ¶ 34.  Doing so would have mitigated the injuries that Perry suffered.  Id.  If DiGiacco did not arrive until 7:45 p.m., he breached the standard of care by failing to consult in a timely manner given his knowledge about the events that had occurred on October 23.  Id. at ¶ 35.  That breach, Meyer claims, caused Perry to miss any window for useful stroke therapies.  Id.

As a preliminary matter, the Court finds that Defendant DiGiacco has met his burden to provide expert testimony and evidence that he did not breach the standard of care or that, if a breach occurred, DiGiacco's breach was not a proximate cause of Perry's injuries. Defendant's experts offer competent evidence and opinion that indicates that DiGiacco responded in an accepted manner to the requests for consultations that he received and that he provided proper treatment based on the circumstances of the case.  They also provide opinions that indicate that Perry's injuries occurred and became irreversible before

DiGiacco could provide any intervention.  Such evidence would permit a reasonable juror to find that Dr. DiGiacco is not liable for medical malpractice in his treatment of William Perry. The burden now shifts to the Plaintiffs to provide expert opinion and other evidence to raise a question of fact about whether DiGiacco engaged in medical malpractice that was a proximate case of Perry's injuries.

Defendant argues that no evidence exists that Dr. Powell requested a neurology consultation from him on October 22, 2018, and therefore no evidence that exists that DiGiacco breached the standard of care.  None of the medical records indicate that Powell entered such an order.  While Defendant acknowledges that Powell testified that he contacted an assistant with a message seeking consultation, no evidence exists that shows that DiGiacco actually received this request.

The Court is not persuaded by this argument.  While no medical records indicate that Powell made such a request or DiGiacco received that request, Powell testified that he made such a phone call, gave a message to DiGiacco's assistant, and provided the relevant medical record information for DiGiacco to access Perry's file.  While DiGiacco denied that he received any message, a reasonable juror could credit this testimony and find that Powell passed on information to DiGiacco that put him on notice of Perry's situation.  Such a reasonable juror could also reject DiGiacco's claims that he did not receive that information and instead infer that DiGiacco received that information from testimony about how information circulated in the hospital and DiGiacco's practices.  The evidence that he received the information is not strong, but it is sufficient for a trier of fact to decide the

issue.[5]  Dr. DiGiacco could be liable if the jury finds the evidence sufficient to indicate that he received Dr. Powell's October 22, 2018 message.

Defendant also argues that his treatment of Perry on October 23, 2018 met the standard of care, whether his examination came at 7:45 a.m. or 7:45 p.m.  Defendant points out that none of the requests for consultation that Dr. DiGiacco received noted that the order was STAT, and thus arriving within 24 hours of the request met the standard of care. A 7:45 p.m. appearance came well within 24 hours of the request.  Without an urgent request, Defendant argues, he had no duty to arrive earlier.  Defendant also contends that Plaintiffs' experts agreed with this standard at their depositions.

The Court is not persuaded by this argument either.  The Court has examined the depositions, as well as the expert reports.  While Plaintiffs' experts generally agreed that a request for consultation in non-emergency circumstances should be filled within 24 hours, their reports and testimony, as explained, also indicated that a neurologist aware of certain conditions has a duty to respond to a request for consultation earlier.  The evidence in this case indicates that Perry suffered both a TIA and a CVA, and that, at the latest, at 6:43 a.m. on October 23, 2018, Defendant became aware of these events.  The evidence in the case also indicates that Dr. DiGiacco was aware of the need for quick intervention in cases of a stroke if treatment hoped to have a positive outcome.  The evidence also indicates that Dr.

---

[5]The Court has read all of the depositions provided by the parties to this case in preparation for deciding this motion.  Recognizing that witnesses at depositions are directed not to volunteer any information, the Court still notes that Dr. DiGiacco was extraordinarily reticent to answer even simple factual questions at his deposition.  He could not, for example, determine whether he had written 7:45 a.m. or 7:45 p.m., and professed not be able to decide whether a letter he had written was an "A" or "P."  A reasonable juror faced with such testimony could doubt Dr. DiGiacco's credibility and discount his claims not to have received the consultation request.

DiGiacco may have waited as long as 13 hours before examining Perry, a delay that

Plaintiffs' experts contend led to avoidable damage more severe than if faster action

occurred.  Plaintiffs' experts–as well as the law–recognize that the standard of care does

not operate only in the abstract, but depends on the circumstances of the case.  Here,

Plaintiffs' experts opine that failing to act with urgency after a neurologist becomes aware of

of a stroke is demonstrates a breach of the standard of care.  While Defendant's experts

may disagree, Plaintiffs' evidence is sufficient to rebut Defendants' prima facie case.  A

question of fact on this issue exists for the jury to resolve.

     Likewise, the experts' disagreement about whether Dr. DiGiacco breached the

standard of care in failing to recommend immediate transfer is a matter for jurors to resolve.

The expert reports the Plaintiffs have provided are sufficient to rebut Defendant's prima

facie case on the issue of breach, and the Court will deny the motion in this respect.

     Defendant also contends that Plaintiffs' expert has not provided sufficient evidence to

rebut his experts' contention that DiGiacco's alleged breaches of the standard of care were

not a proximate cause of Perry's injuries.  He contends that his experts have shown that any

damage that Perry suffered was not preventable or treatable by the time that DiGiacco

became involved in the case.  He also argues that the Plaintiffs' expert has not rebutted this

finding in any sufficient detail but instead merely speculates on what effect earlier or

different intervention would have had in the process.

     As explained above, the Court finds that Plaintiffs' expert has offered sufficient

evidence to raise an issue of fact about whether DiGiacco's alleged breaches of the

standard of care were a proximate cause of Perry's injuries.  First, if the jury concludes that

DiGiacco was aware of Perry's condition on October 22 and had an obligation to provide

treatment at that time, a reasonable juror could also conclude that physicians missed an opportunity to discover the thrombus and employ effective treatment to prevent a stroke. Second, Plaintiff has offered expert evidence that indicates that the damage was treatable shortly after the stroke.  Plaintiff's expert, whose qualifications Defendant does not contest, reads the results of the imaging differently than Defendant's experts.  That expert also expresses more hope for treatment at a time more distant from the last known normal than Defendant's experts.  Meyer is competent to offer that opinion.  If a jury found that opinion more convincing, a reasonable juror could conclude that Dr. DiGiacco's conduct was a proximate cause of Perry's injuries.  This issue is for the jury to resolve.

The Court will therefore deny the motion for summary judgment in this respect as well.  In addition, the Court will deny DiGiacco's motion with respect to Holly Perry's consortium claims.  Since the malpractice claim must be resolved by a jury, so must the derivative claim.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment, dkt. #s 94, 95, are hereby DENIED.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: May 13, 2022